**FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|                                              |   |                                   |
|----------------------------------------------|---|-----------------------------------|
|                                              | : |                                   |
| JAY B. ROSS, et al.                          | : | CIVIL ACTION NO. 05-1300 (MLC)    |
|                                              | : |                                   |
|     Plaintiffs,          | : | **MEMORANDUM OPINION**            |
|                                              | : | **FILED: JUNE 25, 2007**          |
|     v.                   | : |                                   |
|                                              | : |                                   |
| CELTRON INTERNATIONAL, INC.,                 | : |                                   |
| et al.,                                      | : |                                   |
|                                              | : |                                   |
|     Defendants.          | : |                                   |
|                                              | : |                                   |

**COOPER, District Judge**

    **APPEARANCES**

    Paul Castronovo
    Paul Castronovo, LLC, Bedminster, New Jersey
    Attorney for Plaintiffs

    Philip Rosenbach
    Berman Rosenbach, P.C., Morristown, New Jersey
    Attorney for Defendants Allen Harrington, Amanda Harrington,
    Celtron International, Ltd., Celtron International, Inc.,
    and Zirk Engelbrecht

**INTRODUCTION**

    This action, which involves multiple asserted claims against several individuals and entities, arises out of an agreement pursuant to which plaintiffs were to provide technical services for a company that was yet to be formed in consideration of receiving compensation, including certain stock ownership. Discovery is complete, and certain defendants move for summary judgment on some of the claims remaining in the action at this stage. For the reasons stated, the motion is granted in part and denied in part.

Plaintiffs, Jay B. Ross ("Ross") and Protocol Electronics, Inc. (together with Ross, the "Plaintiffs"), commenced this action against defendants, Celtron International, Inc. ("Celtron, Inc."), Allen Harrington ("Harrington"), Amanda Harrington, Marius Jordaan, Ron Pienaar, Celtron International, Ltd. ("Celtron International"), Satellite Security Systems, Inc. ("Satellite"), Kenneth Eade, Cordovano and Honeck, LLP ("C&H"), Rogelio Castro, and Zirk Engelbrecht ("Engelbrecht"), alleging, inter alia, (1) breach of contract, (2) promissory estoppel, (3) fraud, (4) violations of certain provisions of the Securities Exchange Act of 1934, 15 U.S.C. § ("Section") 78 et seq., and Securities Exchange Commission Rule 10b-5 ("Rule 10b-5"), 17 C.F.R. § 240.10b-5, (5) violations of the New Jersey Racketeer Influenced Corrupt Organization Act ("NJRICO"), N.J.S.A. § 2C:41-1 et seq., (6) professional negligence, (7) negligence of officers and directors, (8) tortious interference with contract, and (9) fraudulent conveyance.  (Dkt. entry no. 43, Am. Compl.) C&H filed cross claims against the other defendants seeking contribution and indemnification.  (Dkt. entry no. 27, C&H Ans., Aff. Defenses., & Cross Claims, at 41-44.)

The parties entered into a stipulation on October 16, 2006, pursuant to which Plaintiffs voluntarily dismissed (1) all of their claims against Ron Pienaar, (2) all of their claims against Satellite, (3) all of their claims against C&H, (4) all of their

claims against Amanda Harrington, except their fraudulent conveyance claim (count 14), (5) their fraud in securities filings claim (count 5) as to all Defendants, and (6) their professional negligence claim against Kenneth Eade (count 8). (Dkt. entry no. 64, 1st 10-16-06 Stip.)  Plaintiffs and Kenneth Eade entered into a separate stipulation on October 16, 2006, pursuant to which Plaintiffs voluntarily dismissed all of their claims against Kenneth Eade.  (Dkt. entry no. 65, 2d 10-16-06 Stip.)  Moreover, on June 7, 2007, Plaintiffs voluntarily dismissed all of their claims against Rogelio Castro.  (Dkt. entry no. 84, 6-7-07 Pl. Ltr., at 1.)

Celtron, Inc., Harrington, Celtron International, and Engelbrecht (collectively, the "Defendants") now move for summary judgment on counts 1-4, 6-7, 12, and 13 of the amended complaint. (Dkt. entry no. 68.)  Plaintiffs oppose the motion.  (Dkt. entry nos. 70-72.)  For the reasons stated herein, the Court will (1) deny Defendants' motion for summary judgment with respect to count 1 (breach of contract), count 2 (promissory estoppel), and count 13 (tortious interference with contract), as it pertains to Engelbrecht, of the amended complaint, and (2) grant Defendants' motion for summary judgment with respect to count 3 (common law fraud), count 4 (securities fraud), count 6 (NJRICO), count 7 (NJRICO conspiracy), count 12 (negligence of directors and

3

officers), and count 13 (tortious interference with contract), as it pertains to Harrington, of the amended complaint.

BACKGROUND

Ross is the sole shareholder of Protocol Electronics, Inc., a New Jersey corporation with its principal place of business in Lambertville, New Jersey.  (Dkt entry no. 43, Am. Compl., at ¶¶ 1-2.)  Ross, on behalf of Protocol Electronics, Inc., entered into a letter agreement dated May 23, 1995 ("5-23-95 Agreement") with Harrington, who was acting on behalf of "a Company known as Celtron International . . . [that was] in the process of being formed in the Republic of Ireland."  (Dkt. entry no. 72, Castronovo Aff., Ex. A, 5-23-95 Agmt., at 1.)  The 5-23-95 Agreement provides, <u>inter alia</u>, that (1) Protocol Electronics, Inc. agrees to develop a mobile credit card based cellular pay phone system ("Product") for the new Celtron entity, (2) Protocol Electronics, Inc. will transfer the intellectual property rights to the Product to the new Celtron entity, (3) the new Celtron entity agrees to pay in cash all expenses incurred during the development of the Product, and (4) the new Celtron entity agrees to "allot and issue to Jay B. Ross 15% (fifteen percentage points) of the stock of Celtron International equated in relation to the controlling stockholder".  (<u>Id.</u>)  Shortly thereafter, Celtron International Public Limited Company ("Celtron PLC") was registered in Ireland on July 18, 1995.  (Dkt. entry no. 68, Rosenbach Cert., Ex. B, Celtron Int'l Registration.)

4

Defendants assume, for purposes of this motion only, that Plaintiffs performed the services described in the 5-23-95 Agreement.  (Defs. Stmt. of Mat. Facts, at ¶ 3.)  Ross stated that when he asked Harrington about the stock he was entitled to receive under the 5-23-95 Agreement, Harrington responded, "[i]t's safe.  We're going to keep it offshore.  I don't want anybody monkeying around with the whole stock situation here.  But you know, it is clear, you know, you're supposed to get stock."  (Dkt. entry no. 68, Rosenbach Cert., Ex. C, Ross Dep. Tr., at 103.)  Ross also stated that it was his understanding that his stock was being held for him on the Isle of Man for tax purposes.  (Id. at 104-105; see Defs. Stmt. of Mat. Facts, at ¶ 4 (noting that shares in Celtron PLC were issued to Ross but were held by a trustee located on the Isle of Man for tax purposes).)  Ross asserts that he did not receive any stock certificates or actually own any shares of Celtron PLC.  (Pl. Resp. Stmt. of Mat. Facts, at ¶ 4.)

Celtron PLC owned all of the stock of Celtron Technologies, Inc., a South African company that developed technology for cellular credit card phones.  (Defs. Stmt. of Mat. Facts, at ¶ 5; see Pl. Resp. Stmt. of Mat. Facts, at ¶ 5.)  In 1997, Celtron Technologies, Inc. filed for bankruptcy and was eventually liquidated.  (Dkt. entry no. 68, Rosenbach Cert., Ex. D, Harrington Dep. Tr., at 20.)  On June 9, 2000, Celtron PLC was

de-registered and dissolved.  (Id., Ex. E, 6-16-00 List of De-
registered Irish Cos.)  Less than one year later, on April 17,
2001, Celtron International was incorporated in Niue, a
Polynesian country, as an international business.  (Id., Ex. F,
Celtron Int'l Cert. of Incorp.)  Thereafter, Celtron
International and Et Voila! European Cafes, Inc. ("Et Voila"), a
Nevada corporation, entered into an Asset Acquisition Agreement
dated June 20, 2001 ("6-20-01 Agreement").  (Id., Ex. G., 6-20-01
Agmt.)  The 6-20-01 Agreement states that it is between Et Voila
and Celtron PLC, but Harrington contends that this was a
typographical error because the agreement was actually between Et
Voila and Celtron International.  (Dkt. entry no. 72, Castronovo
Aff., Ex. B, Harrington Dep. Tr., at 166, 169-171.)

        The 6-20-01 Agreement provides, inter alia, that "[i]n
consideration of the sum of 8,000,000 shares of common stock of
[Et Voila], Celtron hereby transfers all right, title and
interest, including good will, trade names, technology,
intellectual property, trade names, patents, copyrights,
equipment, and customer lists to [Et Voila]."  (Dkt. entry no.
68, Rosenbach Cert., Ex. G., 6-20-01 Agmt., at 2.)  On March 28,
2002, Et Viola filed a Certificate of Amendment to its Articles
of Incorporation, in which it changed its name to Celtron, Inc.
(Id., Ex. H, 3-28-02 Cert. of Amend.)  Celtron, Inc. later
changed its name to Satellite in 2006.  (Dkt. entry no. 72,

Castronovo Aff., Ex. I, Engelbrecht Dep. Tr., at 10-11.)
Plaintiffs assert that they "have repeatedly demanded the shares
in Celtron International PLC and its successor/alter ego
Defendant Celtron International, Inc., but Defendants have
refused to comply with the [5-23-95 Agreement]."  (Pl. Stmt. of
Add'l. Mat. Facts, at ¶ 5.)

Harrington, at all times relevant to the amended complaint,
was the chairman of the board of directors, the chief executive
officer ("CEO"), the secretary, a director, and a shareholder of
Celtron, Inc.  (Dkt. entry no. 43, Am. Compl., at ¶ 7.)
Harrington's wife, Amanda Harrington, was the chief financial
officer and a shareholder of Celtron, Inc.  (Id. at ¶ 8.)
Harrington and Amanda Harrington reside in South Africa.  (Id. at
¶¶ 7-8.)  Moreover, in 2001 and 2002, Engelbrecht was an indirect
investor in Celtron, Inc.  (Defs. Stmt. of Mat. Facts, at ¶ 14;
see Pl. Resp. Stmt. of Mat. Facts, at ¶ 14 (stating that
Engelbrecht was the "financier" of Celtron, Inc.).)  After
Celtron, Inc. became Satellite in January of 2006, Engelbrecht
became chairman of the board of directors.  (Pl. Resp. Stmt. of
Mat. Facts, at ¶ 15; see Defs. Stmt. of Mat. Facts, at ¶ 15
(noting that Engelbrecht became a director of Celtron, Inc. in
January of 2006).)  Engelbrecht resides in Beverly Hills,
California.  (Dkt. entry no. 28, Ans., at ¶ 6; Dkt. entry no. 50,
Ans. to Am. Compl.)

**DISCUSSION**

**I.   Summary Judgment Standard**

Rule 56(c) provides that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  The party moving for summary judgment bears the initial burden of showing that there is no genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the movant has met this prima facie burden, the non-movant "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).  A non-movant must present actual evidence that raises a genuine issue of material fact and may not rely on mere allegations.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

The Court must view the evidence in the light most favorable to the non-movant when deciding a summary judgment motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  At the summary judgment stage, the Court's role is "not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.  Under this standard, the "mere existence of a scintilla of evidence in support of the

[non-movant's] position will be insufficient [to defeat a Rule
56(c) motion]; there must be evidence on which the jury could
reasonably find for the [non-movant]." Id. at 252.  "By its very
terms, this standard provides that the mere existence of some
alleged factual dispute between the parties will not defeat an
otherwise properly supported motion for summary judgment; the
requirement is that there be no genuine issue of material fact."
Id. at 247-48 (emphasis in original).  A fact is material only if
it might affect the action's outcome under governing law.  Id. at
248.  "[T]here is no issue for trial unless there is sufficient
evidence favoring the nonmoving party for a jury to return a
verdict for that party.  If the evidence is merely colorable, or
is not significantly probative, summary judgment may be granted."
Id. at 249-50 (internal citations omitted).

## II.   Summary Judgment Standard Applied Here

### A.   Breach of Contract

Plaintiffs allege that (1) Celtron International and its
successors, Et Voila and Celtron, Inc., entered into a valid and
binding contract with Protocol Electronics, Inc., (2) Ross is an
express third-party beneficiary of that contract, (3) they fully
performed their obligations under the contract, and (4) Celtron
International and its successors failed to perform their
obligations under the contract.  (Dkt. entry no. 43, Am. Compl.,
at ¶¶ 94-97.)  Plaintiffs further allege that Harrington was

9

Celtron PLC's promoter at the time the 5-23-95 Agreement was executed, and thus, he is also liable for any breach of that agreement.  (Pl. Br., at 7.)  Similarly, Plaintiffs assert that Celtron, Inc. adopted and ratified the 5-23-95 Agreement because Harrington, the chairman and CEO of Celtron, Inc. repeatedly told Ross in email exchanges that he was entitled to 1.8 million shares of Celtron, Inc. under the 5-23-95 Agreement.  (Id. at 8-9.)  Lastly, Plaintiffs argue that because Celtron, Inc. has the same leadership, controlling shareholders, and products that Celtron, PLC had before it de-registered, these entities "are mere alter egos of each other."  (Id. at 9-10.)

Celtron, Inc. and Celtron, International, in contrast, argue that they did not breach the 5-23-05 Agreement because (1) Ross was issued stock in Celtron PLC, but this stock lost all of its value when Celtron PLC de-registered in 2000, (2) Ross lost his entitlement to any stock when Celtron PLC de-registered in 2000, and (3) Celtron, Inc. is not a successor in interest to Celtron PLC, and thus, it has no duty to perform Celtron PLC's contractual obligations. (Defs. Br., at 2-3.)  Thus, the parties do not dispute the meaning of the 5-23-95 Agreement's terms, but instead disagree about whether Celtron International and Celtron, Inc. may be held liable under that agreement, and whether the agreement entitles Ross to stock in either entity.

10

Based on the evidence presented by the parties in this motion, we find that genuine issues of material fact preclude summary judgment on Plaintiffs' breach of contract claim insofar as it is asserted against Celtron International and Celtron, Inc. Specifically, material factual issues exist regarding whether (1) Celtron PLC continued using the credit card based cellular phone technology that Celtron Technologies, Inc. developed after Celtron Technologies, Inc. liquidated its assets, (2) Celtron PLC had any assets other than the stock of Celtron Technologies, Inc., (3) Celtron PLC continued to conduct business after its major asset, Celtron Technologies, Inc., liquidated, (4) Celtron International ever owned any assets previously owned by Celtron PLC, (5) Celtron International acquired approximately 57% of the stock of Et Voila on June 11, 2001 pursuant to a contract dated February 13, 2001, (6) Et Voila acquired certain assets of either Celtron PLC or Celtron International under the 6-20-01 Agreement, and (7) Celtron, Inc. is a successor of Celtron International. (See Defs. Stmt. of Mat. Facts at ¶¶ 5, 7-8, 10-11; Pl. Resp. Stmt. of Mat. Facts at ¶¶ 5, 7-8, 10-11.)  Therefore, the Court will deny the motion for summary judgment on Plaintiffs' breach of contract claim insofar as it is asserted against Celtron International and Celtron, Inc.

The Court will also deny the motion for summary judgment on Plaintiffs' breach of contract claim insofar as it is asserted

11

against Harrington.  The 5-23-95 Agreement does not contain a choice of law provision.  Under New Jersey choice of law rules, the Court must use "the law of the place of contracting to determine the validity of a contractual provision." Farris Eng'g Corp. v. Serv. Bur. Corp., 406 F.2d 519, 520 (3d Cir. 1969) (noting that a New Jersey District court must apply New Jersey's choice of law rules).  "New Jersey choice of law principles require a governmental interest analysis, in which the forum court compares the interest of the states whose laws are potentially involved in the underlying action and determines which state has the greatest interest in having its laws applied." ASCO Power Tech., L.P. v. PEPCP Tech., L.L.C., No. 03-1942, 2006 U.S. Dist. LEXIS 76368, at *11 (D.N.J. Oct. 19, 2006); see Karykous v. Sbarro, Inc., No. 06-2452, 2006 U.S. Dist. LEXIS 66900, at *7 (D.N.J. Sept. 19, 2006) (explaining that New Jersey courts apply the law of the state with the greatest interest in resolving the particular issue).

The governmental interest analysis must be done on an issue-by-issue basis, which may result in the Court applying different states' laws to different issues in a particular action. ASCO Power Tech., L.P., 2006 U.S. Dist. LEXIS 76368, at *12.  Further, the analysis involves determining whether there is an actual conflict between the laws of the states involved. Karykous, 2006 U.S. Dist. LEXIS 66900, at *7.  If there is no conflict, the

Court applies the law of the forum state.  Id.  If there is a
conflict, however, the Court must identify the governmental
policies underlying each state's laws and how those policies are
affected by the litigation.  Id.

Plaintiffs, in arguing that Harrington is liable under the
5-23-95 Agreement, assert that New Jersey law governs the
agreement.  (Pl. Reply Br., at 1.)  Under New Jersey law, an
individual who executes a contract on behalf of a corporation
that is not yet in existence, a promoter, may be held liable
under such contract "[w]hether or not the corporation were later
to 'adopt' the contract."  K&J Clayton Holding Corp. v. Keuffel &
Esser Co., 113 N.J. Super. 50, 53 (N.J. Super. 1971); see Pharm.
Sales Consulting Corp. v. J.W.S. Delavau Co., Inc., 59 F.Supp.2d
408, 416 n.11 (D.N.J. 1999) ("[Plaintiff] could be held
personally liable for his conduct which forms the basis for
defendant's counterclaims on the theory that he was a promoter
engaging in actions on behalf of the not-yet existent
corporation.").  Harrington, however, asserts that Nevada law
applies.  (See Pl. Reply Br., at 1.)  Nevada law provides that a
corporation may expressly or impliedly ratify a pre-incorporation
contract and make it a valid obligation of the corporation.
Jacobson v. Stern, 605 P.2d 198, 201 (Nev. 1980).  "However,
liability of the corporation by adoption does not, absent a
novation, end the liability of the promoter to the third party."
Id.

The Court need not determine at this time whether New Jersey or Nevada law governs the 5-23-95 Agreement because material factual issues prevent the Court from determining whether Harrington is liable for any alleged breach of the 5-23-95 Agreement under either state's laws.  Specifically, the parties have not offered evidence suggesting, inter alia, whether (1) Celtron PLC engaged in any conduct after it was incorporated that could be construed as an "adoption" of the 5-23-95 Agreement, including paying Plaintiffs for all expenses incurred in developing the Product, and (2) Plaintiffs expressly or impliedly assented to the substitution of Celtron PLC for Harrington by, for example, accepting payments or some other form of partial performance from Celtron PLC.  See Jacobson, 605 P.2d at 201 (noting that a valid novation may occur if the creditor accepts part performance from the new obligor).  Accordingly, the Court will deny the motion for summary judgment on Plaintiffs' breach of contract claim.

**B.    Promissory Estoppel**

Plaintiffs assert that Harrington, Celtron International, and Celtron, Inc. made clear and definite promises to Plaintiffs that Ross would receive 1.8 million shares of Celtron, Inc. after a two-year restriction period ended in 2004, and expected Plaintiffs to rely on these promises.  (Dkt. entry no. 43, Am. Compl., at ¶¶ 100-101.)  Plaintiffs further assert that Ross

reasonably relied on these promises and suffered damages as a
result.  (Id. at ¶¶ 102-103.)  In contrast, Defendants argue that
neither Harrington nor any of the other defendants made any such
promises to Ross.  (Defs. Br., at 6.)  Defendants also argue that
Ross cannot show that he reasonably relied on these alleged
promises to his detriment.  (Id. at 6-7.)

     The parties agree that New Jersey law applies to Plaintiffs'
promissory estoppel claim.  (See Pl. Br., at 12; Defs. Br., at
6.)  To succeed on a promissory estoppel claim under New Jersey
law, a plaintiff must show (1) a clear and definite promise, (2)
the promisor expected that the promisee would rely on such
promise, (3) the promisee reasonably relied on the promise, and
(4) the promisee suffered a definite and substantial detriment
due to the reliance "such that the promise should be enforced to
avoid injustice."  Rodichok v. Limitorque Corp., No. 95-3528,
1997 U.S. Dist. LEXIS 9975, at *40 (D.N.J. July 8, 1997); see ETC
Int'l, Inc. v. Curriculum Advantage, Inc., No. 03-5898, 2006 U.S.
Dist. LEXIS 39284, at *16 n.10 (D.N.J. June 13, 2006) (listing
four elements of the doctrine of promissory estoppel).  "Under
New Jersey law, 'the sine qua non' of a promissory estoppel claim
is a 'clear and definite promise.'"  Zarrilli v. John Hancock Life
Ins. Co., No. 06-1642, 2007 U.S. App. LEXIS 7753, at *6 (3d Cir.
April 3, 2007).

15

Plaintiffs' and Defendants' conflicting assertions preclude summary judgment here because questions of fact as well as issues of credibility and reliance exist.  The parties dispute whether Harrington clearly and definitely promised Ross stock in Celtron, Inc. in emails dated July 9, 2001, September 4, 2001, January 15, 2002, April 16, 2002, November 11, 2002, and November 18, 2002, (See Pl. Stmt. of Add'l. Mat. Facts., at ¶¶ 33, 35-39; Defs. Resp. to Pl. Stmt. of Add'l. Mat. Facts, at ¶¶ 33, 35-39). Further, the parties offer no evidence regarding Harrington's expectations when making these promises.  Finally, Defendants contend that at the time these alleged promises were made, Plaintiffs' performance under the 5-23-95 Agreement "had long ceased."  (Defs. Br., at 6.)  Plaintiffs contend, however, that they continued performing work for the Celtron entities into 2003.  (See 6-7-07 Pl. Lttr., Ex. B., Ross Dep. Tr., at 135.) Accordingly, a genuine issue of material fact exists regarding whether Ross relied on Harrington's alleged promises that he would be issued stock in Celtron, Inc. to his detriment by continuing to perform services for the Celtron entities.  Thus, the Court will deny Defendants' motion for summary judgment with respect to Plaintiffs' promissory estoppel claim.[1]

_____

[1] Plaintiffs also assert that they detrimentally relied on Harrington's promises "by continuing to believe that [Ross] would get 1.8 million shares after the purported two-year restriction period ended in November 2004."  (Pl. Stmt. of Add'l. Mat. Facts, at ¶ 46.)  However, to succeed on a promissory estoppel claim a

C.    **Common Law Fraud**

Plaintiffs assert that Harrington, Celtron International, and Celtron, Inc. represented to Ross that he would receive 1.8 million shares of Celtron, Inc.'s stock after a restriction period expired in November of 2004, even though they knew or believed such representations were false.  (Dkt. entry no. 43, Am. Compl., at ¶¶ 105-106.)  Also, Plaintiffs assert that Harrington, Celtron International, and Celtron, Inc. intended to deceive Ross, and Ross suffered damages as a result of his reliance on the false representations.  (Id. at ¶¶ 107-108.) Defendants, in contrast, assert that Harrington denies making any of the alleged false representations and note that "by November 2002 [he] was on record as stating that Ross was not entitled to any stock in Celtron [, Inc.]" (Defs. Br., at 8.)  Accordingly, Defendants contend that "Ross could not have possibly relied on any representations made at any time to wait until November 2004 to receive stock" and "cannot show any detriment resulting from his alleged reliance."  (Id.)

To establish a claim for common law fraud under New Jersey

---

plaintiff must show that he or she took an action that "amounted to a substantial change of position."  Ankerstjerne v. Schlumberger, Ltd., 155 Fed.Appx. 48, 51 (3d Cir. 2005).  Thus, Plaintiffs cannot establish the detrimental reliance element of their promissory estoppel claim simply by asserting that they did not pursue legal action or otherwise attempt to access Ross's stock because they erroneously believed that they would receive such stock after the restriction period ended.

law, a plaintiff must show that (1) the defendant made a material misrepresentation of a presently existing or past fact, (2) the defendant knew or believed the statement was false, (3) the defendant intended for the plaintiff to rely on the misrepresentation, (4) the plaintiff relied on the misrepresentation, and (5) the plaintiff was damaged.  <u>Angrisani v. Capital Access Network, Inc.</u>, 175 Fed.Appx. 554, 556 (3d Cir. 2006).  However, "[s]tatements as to future or contingent events, as to expectations and probabilities, or as to what will be or is intended to be done in the future, do not constitute misrepresentations even though they turn out to be false, at least where they are not made with intent to deceive, and where the parties have equal means of knowledge."  <u>Id.</u>  Similarly, "puffery" and "ill-defined opinions" also do not constitute misrepresentations.  <u>Id.</u>

The economic loss doctrine prevents a plaintiff from recovering in tort for economic losses flowing from a contract.  <u>Duquesne Light Co. v. Westinghouse Elec. Corp.</u>, 66 F.3d 604, 618 (3d Cir. 1995).  However, "[n]o New Jersey Supreme Court case holds that a fraud claim cannot be maintained if based on the same underlying facts as a contract claim."  <u>Gleason v. Norwest Mortg., Inc.</u>, 243 F.3d 130, 144 (3d Cir. 2001).  Nevertheless, the distinction between fraud in the inducement and fraud in the performance of a contract remains relevant to the application of

the economic loss doctrine in New Jersey.  Specifically, courts have continued to affirm "the conceptual distinction between a misrepresentation of a statement of intent at the time of contracting, which then induces detrimental reliance on the part of the promisee, and the subsequent failure of the promisor to do what he has promised."  Lo Bosco v. Kure Eng'g Ltd., 891 F.Supp. 1020, 1032 (D.N.J. 1995).  Thus, New Jersey federal and state courts permit fraud claims to proceed with a breach of contract claim when the fraud arises out of fraud in the inducement or pre-contractual misrepresentations.  Vukovich v. Haifa, Inc., No. 03-737, 2007 U.S. Dist. LEXIS 13344, at *24 (D.N.J. Feb. 28, 2007).  Accordingly, the "mere 'subsequent failure of the promisor to do what he has promised' is not recoverable in tort." Id.

The alleged misstatements underlying Plaintiffs' common law fraud claim are contained in Harrington's emails to Ross dated July 9, 2001, September 4, 2001, January 15, 2002, April 16, 2002, November 11, 2002, and November 18, 2002. (See Pl. Stmt. of Add'l. Mat. Facts., at ¶¶ 33, 35-39; Pl. Br., at 13.)  According to Plaintiffs, Harrington, who was acting on behalf of Celtron International and Celtron, Inc., falsely represented to Ross that he would receive 1.8 million shares of stock in Celtron, Inc., but never intended to issue such stock to Ross.  (See dkt. entry no. 43, Am. Compl., at ¶ 105; Pl. Stmt. of Add'l. Mat. Facts., at

¶¶ 33, 35-39).  Thus, because these alleged misstatements were made after the 5-23-95 Agreement was executed and constitute promises to perform under that Agreement, Plaintiffs have only asserted a fraud in the performance claim.  See Vukovich, 2007 U.S. Dist. LEXIS 13344, at *24 (explaining that under the economic loss doctrine, the Court, in evaluating a common law fraud claim, can only consider the defendants' alleged misstatements and omissions made prior to making the agreement with the plaintiff).  Plaintiffs, however, have not shown that at the time the 5-23-95 Agreement was executed, either Harrington or the soon-to-be-formed Celtron entity had a present intent not to perform their obligations under that agreement.  Therefore, because the misrepresentations underlying Plaintiffs' fraud claim arose during performance of the 5-23-95 Agreement, Plaintiffs' fraud claim is barred by the economic loss doctrine.  See id. at *24-*25 (stating that the Court can only consider a fraud in the inducement claim alongside a breach of contract claim).

**D.   Section 10(b) and Rule 10b-5**

Plaintiffs allege that Defendants made materially false statements or omissions regarding the stock ownership of Celtron, Inc. and its predecessors in violation of Section 78j ("Section 10(b)")[2] and Rule 10b-5.  (Dkt. entry no. 43, Am. Compl., at ¶

---

[2] Before the Securities Exchange Act was codified, the contents of Section 78j appeared in section 10(b) of Public Law 73-291.  See 73 Pub.L.No. 291, 48 Stat. 881 (1934).  As a result,

111.)   Plaintiffs further allege that (1) Defendants knew these statements and omissions were false or recklessly disregarded their falsity, (2) Ross relied upon the false statements and omissions to his detriment, and (3) as a result of these statements and omissions, Ross lost value in his 1.8 million shares of Celtron, Inc.'s stock, which traded as high as $2.10 per share on August 15, 2003.  (Id. at ¶¶ 112-115.)   In contrast, Defendants allege that they are entitled to summary judgment on Plaintiffs' 10b and Rule 10b-5 claim because Plaintiffs have not established any causal link between Defendants' alleged misconduct and a drop in the value of Celtron, Inc.'s stock. (Defs. Br., at 10-11.)

Section 10(b) and Rule 10b-5 create liability for securities fraud.  Section 10(b) provides, in pertinent part:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange –

>> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities Exchange Commission] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.  Rule 10b-5, which establishes a private cause

---

this provision is commonly referred to as Section 10(b) of the Securities Exchange Act of 1934.

of action, was promulgated by the Securities Exchange Commission in order to implement this section.  Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 729 (1975).  Rule 10b-5 makes it unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To state a claim for relief under Section 10(b) and Rule 10b-5, a plaintiff must plead facts that satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995, Section 78u-4, et seq., and must demonstrate that (1) the defendant made a materially false or misleading statement or omitted a material fact necessary to make a statement not misleading, (2) the defendant acted with scienter, and (3) the plaintiff relied on the defendant's misstatements or omissions and this caused the injury.  Cal. Public Employees' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 143 (3d Cir. 2004).  Defendants can be liable for both affirmative misstatements and misleading omissions.  Omissions, however, can give rise to liability only where the defendant had

an affirmative duty to disclose the information in question, such
as "when there is insider trading, a statute requiring
disclosure, or an inaccurate, incomplete or misleading prior
disclosure." Oran v. Stafford, 226 F.3d 275, 285-86 (3d Cir.
2000); see In re Aetna Inc. Sec. Litig., 34 F.Supp.2d 935, 948
(E.D. Pa. 1999) ("There is a duty to disclose information when
disclosure is necessary to make defendants' other statements,
whether mandatory or volunteered, not misleading.").

Rule 10b-5 "explicitly require[s] a well-pleaded allegation
that the purported misrepresentations or omissions at issue were
material." C.W. Sommer & Co. v. Rockefeller (In re Rockefeller),
311 F.3d 198, 211 (3d Cir. 2002). A fact is material only if
"there [is] a substantial likelihood that [it] would have been
viewed by the reasonable investor as having significantly altered
the 'total mix' of information made available" to the investing
public. TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449
(1976). The "materiality of disclosed information may be
measured post hoc by looking to the movement, in the period
immediately following disclosure, of the price of the firm's
stock." In re Merck & Co., Inc., 432 F.3d 261, 269 (3d Cir.
2005) (discussing the efficient market hypothesis). Moreover, to
be actionable, a material misstatement "must be made with
conscious or reckless disregard of its falsity." In re ATI
Techs., Inc., Sec. Litig., 216 F.Supp.2d 418, 428 (E.D. Pa.

23

2002).  To establish this state of mind the plaintiff must plead facts that either (1) constitute circumstantial evidence of either reckless or conscious behavior or (2) establish a "motive and opportunity" to commit fraud.  In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 276 (3d Cir. 2006).

The plaintiff, to establish a Section 10(b) and Rule 10b-5 claim, also must demonstrate that he or she reasonably relied on the defendant's allegedly fraudulent misrepresentations or omissions.  Jones v. Intelli-Check, Inc., 274 F.Supp.2d 615, 632 (D.N.J. 2003).  Lastly, the plaintiff must plead (1) damages and (2) that his or her reliance on the fraud proximately caused those damages.  See Semerenko v. Cendant Corp., 223 F.3d 165, 174 (3d Cir. 2000).

Even assuming Plaintiffs can demonstrate that they relied on Harrington and Celtron, Inc.'s intentional misstatements regarding Ross's entitlement to 1.8 million shares of Celtron, Inc.'s stock, Plaintiffs Section 10(b) and Rule 10b-5 claim still must fail because they cannot show that these misstatements were material or that they caused Plaintiffs to suffer any economic loss.  As with their common law fraud claim, the alleged misstatements underlying Plaintiffs' securities fraud claim are Harrington's email promises to Ross that he would receive shares of stock in Celtron, Inc. following a restriction period.  (Pl. Br., at 14; see Pl. Stmt. of Add'l. Mat. Facts., at ¶¶ 33, 35-

24

39.)  However, these statements are pertinent only to Ross, and thus, in no way alter or affect the "total mix" of information available to potential investors.  See TSC Indus., Inc., 426 U.S. at 449.  Even if it were now disclosed that Ross owns 15% of Celtron, Inc.'s stock, the price of the stock would not be affected and the investing public likely would have no interest in this information.  See In re Merck & Co., Inc., 432 F.3d at 269 (noting that materiality may be measured by looking at whether the price of the stock changes immediately following disclosure).

Plaintiffs also cannot demonstrate that these alleged misstatements caused them any harm because (1) in the absence of these statements, Ross still would not have received any stock in Celtron, Inc., and (2) these statements did not affect the price of Celtron Inc.'s stock in any way.  See Newton v. Merrill Lynch, 259 F.3d 154, 177-78 (3d Cir. 2001) (explaining that failure to show actual damages is a fatal defect to a Rule 10b-5 claim and "investors cannot complain about a fraud that did not cause them any harm").  Therefore, Plaintiffs have not rebutted Defendants' prima facie showing that there is no causal connection between Defendants' alleged misstatements and any alleged economic loss Plaintiffs suffered.  Accordingly, summary judgment is appropriate on Plaintiffs' Section 10(b) and Rule 10b-5 claim.[3]

---

[3] Although Plaintiffs' brief lists only Harrington's email promises to Ross as the misstatements underlying their Section

### E.    NJRICO

Plaintiffs allege that Defendants violated sections 2C:41-2(c) ("Section c") and 2C:41-2(d) ("Section d") of NJRICO by agreeing to participate in the acts of a corrupt enterprise and committing various corrupt acts, including sending fraudulent emails and filing documents containing false representations with the Securities Exchange Commission.  (See dkt. entry no. 43, Am. Compl., at ¶¶ 125, 147-148, 150-151, 153-154.)  Further, Plaintiffs allege, inter alia, that (1) Defendants "associate together as members of a corrupt enterprise whose activities affect trade and commerce", (2) Defendants committed crimes defined in chapter 21 of Title 2C of the New Jersey Statutes, including conspiracy, theft by unlawful taking, theft by deception, receiving stolen property, filing false documents, issuing false financial statements, deceptive business practices, breach of the duty to act disinterestedly, money laundering, false statement under oath, false unsworn statement, and official misconduct, and (3) the crimes were committed with the common

---

10(b) and Rule 10b-5 claim, Plaintiffs indicated at oral argument on May 31, 2007, that their securities fraud claim is also based on the omission of Ross's stock interest in Celtron, Inc. from securities filings.  However, for the same reasons discussed supra, Plaintiffs cannot show that these omissions were material or that they caused Plaintiffs to suffer any economic loss. Further, the Court notes that Plaintiffs voluntarily dismissed their claim under 15 U.S.C. § 78r, which expressly pertains to fraud in securities filings.  (See dkt. entry no. 64, 1st 10-16-06 Stip.)

purpose of defrauding Ross.  (<u>Id.</u> at ¶¶ 136, 144-146; Pl. Br., at
18.)

NJRICO provides that "[a]ny person damaged in his business
or property by reason of a violation of [N.J.S.A.] § 2C:41-2 may
sue therefor in any appropriate court and shall recover threefold
any damages he sustains and the cost of the suit. . . ."
N.J.S.A. § 2C:41-4(c).  To properly plead a NJRICO claim, the
plaintiff must comply with Federal Rule of Civil Procedure 9(b),
which requires that allegations of fraud be pled with
particularity.  <u>See</u> <u>Lum v. Bank of Am.</u>, 361 F.3d 217, 223-24 (3d
Cir. 2004) (discussing requirements for adequately pleading a
violation of the federal Racketeer Influenced and Corrupt
Organizations Act "RICO", 18 U.S.C. § 1961, <u>et</u> <u>seq.</u> ).  "[T]he
plaintiffs must plead with particularity the 'circumstances' of
the alleged wrongdoing in order to place the defendants on notice
of the precise misconduct with which they are charged."  <u>Rose v.</u>
<u>Bartle</u>, 871 F.2d 331, 366 (3d Cir. 1989).

Section c states that "[i]t shall be unlawful for any person
employed by or associated with any enterprise engaged in or
activities of which affect trade or commerce to conduct or
participate, directly or indirectly, in the conduct of the
enterprise's affairs through a pattern of racketeering activity
or collection of unlawful debt."  N.J.S.A. § 2C:41-2(c).  An
enterprise "includes any individual, sole proprietorship,

27

partnership, corporation, business or charitable trust, association, or other legal entity, any union or group of individuals associated in fact although not a legal entity, and it includes illicit as well as licit enterprises and governmental as well as other entities." N.J.S.A. § 2C:41-1(c). Moreover, a "pattern of racketeering" requires at least two incidents of racketeering conduct, which embrace criminal conduct with the same or similar purposes, results, participants, victims, or methods of commission and are not isolated incidents. N.J.S.A. § 2C:41-1(d). "Racketeering activity" includes, <u>inter alia</u>, bribery, extortion, forgery and fraudulent practices, fraud in the offering, purchase, or sale of securities, and all crimes defined in chapter 21 of Title 2C of the New Jersey Statutes. N.J.S.A. § 2C:41-1(a).

Section d makes it unlawful for any person to conspire to violate any provision NJRICO's prohibited activities provision. N.J.S.A. § 2C:41-2(d). A NJRICO conspiracy has two elements:

> an agreement to violate RICO and the existence of an
> enterprise. The agreement to violate RICO itself has
> two aspects. One involves the agreement proper, that
> is, an agreement to conduct or participate in the
> conduct or the affairs of the enterprise. The other
> involves an agreement to the commission of at least two
> predicate acts. If either agreement is lacking, the
> defendant has not embraced the objective of the
> conspiracy — the substantive violation of the RICO Act
> — that is required for any conspiracy conviction under
> classic conspiracy law.

<u>N.J. v. Ball</u>, 661 A.2d 251, 268 (N.J. 1995).

The Court, after viewing the evidence in the light most favorable to Plaintiffs, finds that summary judgment is appropriate on Plaintiffs' NJRICO claim.  NJRICO broadly defines an "enterprise" as including any group of individuals associated in fact, and thus, Harrington, Celtron, Inc., Celtron International, and Engelbrecht constitute an "enterprise" due to their business association and common interest in the success of the Celtron entities.  See N.J.S.A. § 2C:41-1(c).  (Dkt. entry no. 84, 6-7-07 Pl. Lttr., Ex. A (indicating that Plaintiffs currently assert their NJRICO claim only against Harrington, Engelbrecht, Celtron, Inc., and Celtron International).)  However, Plaintiffs have not asserted that this enterprise engaged in a "pattern of racketeering".  In Banks v. Wolk, the Third Circuit determined that a scheme pertaining to a single transaction or occurrence cannot constitute a "pattern of racketeering".  918 F.2d 418, 422 (3d Cir. 1990) (discussing "pattern of racketeering" in connection with a federal RICO claim).  There, Donald Wolk ("Wolk") and Philip Banks ("Banks") were partners who owned a building in Philadelphia ("Building").  Id. at 420.  Banks and Wolk entered into an agreement to sell the Building to Brad Cohen, Larry Cohen (together with Brad Cohen, the "Cohens"), and First Fidelity Financial Group ("FFFG").  Id.  However, Wolk did not disclose to Banks that he was also a partner in the buying enterprise and would become 50% owner of

29

the Building after the sale.  <u>Id.</u>  The sale did not occur.  <u>Id.</u>
Banks commenced an action against Wolk, FFFG, the Cohens, and the
buying enterprise's attorney alleging that they committed two or
more acts of mail and wire fraud in violation of the federal RICO
statute.  <u>Id.</u>[4]  The district court granted a motion to dismiss
the RICO claim for failure to allege a "pattern of racketeering
activity".  <u>Id.</u>

The Third Circuit explained that a "pattern" requires that
the "racketeering acts are related, <u>and</u> that they amount to or
pose a threat of continued criminal activity."  <u>Id.</u> at 421-22
(emphasis in original).  The court stated that the "relatedness"
requirement was satisfied because the Building scheme involved a
single real estate transaction.  <u>Id.</u> at 422.  The court noted
that the Building scheme was "an attempt to defraud a single
investor of his interest in a single piece of real estate over a
relatively short period of time."  <u>Id.</u>  The court explained that
because Wolk and the attorney's actions were directed solely at
defrauding Banks, they did not amount to or threaten long-term
criminal activity.  <u>Id.</u> at 423.  Thus, the court concluded that
because there was no indication that Wolk or the attorney would
engage in future misconduct, their conduct amounted "to nothing

---

[4]  "[T]he New Jersey Supreme Court believe[s] the New Jersey
RICO statute was and should be consistent with the federal RICO
statute."  <u>Cetel v. Cmmw. Life Ins. Co.</u>, 460 F.3d 494, 510 (3d
Cir. 2006).

more than an isolated incident of 'garden variety' real estate
fraud." <u>Id.</u>

Plaintiffs' NJRICO claim focuses solely on Defendants'
failure to give Ross 1.8 million shares of Celtron, Inc.'s stock.
Each allegation of misconduct relates to Defendants' scheme to
prevent Ross from obtaining his stock.  Accordingly, Plaintiffs
can establish that these acts are sufficiently related.  See <u>id.</u>
at 421-22.  However, Plaintiffs do not allege that any other
person or entity was wrongly denied shares in any Celtron entity.
They also do not allege that Harrington, Engelbrecht, Celtron,
Inc., or Celtron International committed any criminal act
unrelated to the refusal to issue Ross Celtron, Inc. stock.  In
fact, Plaintiffs voluntarily dismissed count five of the amended
complaint in which they alleged that Defendants' fraudulent
conduct included making material false statements or omissions in
documents filed with the Securities Exchange Commission.  (<u>See</u>
dkt. entry no. 43, Am. Compl., at ¶¶ 117-122.)

Although the fraud allegedly perpetrated against Ross, if
proven, might violate more than one criminal statute, this does
not mean that it constitutes more than one incident of
racketeering conduct.  Further, this Court notes that Plaintiffs
have not substantiated their general assertions that Harrington
and Engelbrecht committed wire fraud through email, and various
other crimes set forth in chapter 21 of Title 2C of the New

31

Jersey Statutes.  (See Pl. Br., at 18 (listing crimes Harrington
and Engelbrecht allegedly committed with no analysis regarding
the elements of such crimes or evidence to support the
allegations).).  Therefore, the allegations underlying
Plaintiffs' NJRICO claim pertain to an isolated incident of
fraud.  Thus, assuming Plaintiffs' allegations are true,
Defendants' actions were directed solely at defrauding Ross of
his interest in Celtron, Inc., and do not suggest that they will
engage in future criminal activity.  See Banks, 918 F.2d at 423.
Because Plaintiffs have only alleged one incident of racketeering
activity, they cannot rebut Defendants' prima facie showing that
they are entitled to summary judgment with respect to the NJRICO
claim.[5]

**F.  Negligence of Directors and Officers**

Plaintiffs assert that Harrington owed a duty to all
Celtron, Inc. investors to ensure the accuracy of its securities
filings.  (See dkt. entry no. 43, Am. Compl., at ¶ 188; see also
Pl. Br., at 20.)  Further, Plaintiffs assert that (1) Harrington,

---

[5] Because the Court has determined that Defendants are
entitled to summary judgment on Plaintiffs' NJRICO claim, the
Court also will grant Defendants' motion for summary judgment
with respect to Plaintiffs' NJRICO conspiracy claim.  As
discussed in more detail above, Plaintiffs have not alleged that
Defendants committed or agreed to commit two predicate acts.
Instead, their allegations focus on a single incident that does
not establish a "pattern" of racketeering.  See N.J. v. Ball, 661
A.2d at 268 (explaining that a NJRICO conspiracy requires an
agreement to commit at least two predicate acts).

as an officer and director of Celtron, Inc., "failed to conduct
proper due diligence" and "reasonably could have discovered the
twelve-percent (12%) ownership interest of [Ross] and informed
[Celtron, Inc.] . . . to disclose this ownership interest to the
public and investors", (2) Ross reasonably relied on Harrington
to protect his interest as a shareholder in Celtron, Inc., and
(3) Ross has suffered damages as a result of Harrington's
negligence.  (See dkt. entry no. 43, Am. Compl., at ¶¶ 189-190,
192-193; see also Pl. Br., at 20.)  Defendants, however, argue
that because Plaintiffs' negligence claim against Harrington is
premised on their assertion that Celtron, Inc.'s securities
filings improperly fail to acknowledge Ross's ownership interest,
"Ross could not have possibly relied on these securities filings
in any respect and their accuracy or inaccuracy cannot possible
[sic] have caused Ross to suffer any injuries."  (Defs. Br., at
19.)

        Under New Jersey law, "any tort of negligence requires the
plaintiff to prove that the putative tortfeasor breached a duty
of care owed to plaintiff and that plaintiff suffered damages
proximately caused by the breach."  Highlands Ins. Co. v. Hobbs
Group, LLC, 373 F.3d 347, 351 (3d Cir. 2004) (citations omitted);
Keith v. Truck Stops Corp. of Am., 909 F.2d 743, (3d Cir. 1990)
(explaining that in negligence cases under New Jersey law the
plaintiff must establish that the defendant breached a duty of
reasonable care that proximately caused the plaintiff's

injuries).  Thus, to state a claim for negligent misrepresentation, the plaintiff must show that (1) the defendant negligently provided false information, (2) the plaintiff relied on this information, and (3) the plaintiff's damages were proximately caused by such reliance.  See Highlands Ins. Co., 373 F.3d at 351; Stout-Brunswick Assoc. LP v. Bankers Trust Co., No. 98-3206, 2004 U.S. Dist. LEXIS 29426, at *14 (D.N.J. Dec. 23, 2004) ("To establish a claim for negligent misrepresentation under New Jersey law, plaintiffs must show that Defendant 'negligently made an incorrect statement, upon which the plaintiff[s] justifiably relied.'").

The New Jersey Business Corporations Act requires corporate directors to "discharge their duties in good faith and with that degree of diligence, care and skill which ordinarily prudent men would exercise under similar circumstances in like positions." N.J.S.A. § 14A:6-14(1).  However,

> [c]ases involving nonfeasance present a much more difficult causation question than those in which the director has committed an affirmative act of negligence leading to the loss.  Analysis in cases of negligent omissions calls for determination of the reasonable steps a director should have taken and whether that course of action would have averted the loss.

Francis v. United Jersey Bank, 432 A.2d 814, 826 (N.J. 1981).

Plaintiffs here assert that Harrington negligently misrepresented the stock ownership of Celtron, Inc. in its securities filings.  (See dkt. entry no. 23, Am. Compl., at ¶¶

189-193.)  However, even if Plaintiffs are able to show that
Harrington owed Ross a duty of care and breached this duty by
failing to acknowledge Ross's ownership interest in Celtron,
Inc.'s securities filings, Plaintiffs' negligence claim against
Harrington still must fail because they cannot demonstrate that
such misstatements or omissions damaged Ross.  Ross's alleged
damages arise from Defendants refusing to issue him Celtron, Inc.
stock, which he believes he is entitled to receive under the 5-
23-95 Agreement.  Because Celtron, Inc.'s securities filings do
not list Ross as having any ownership interest in the company,
Ross could not rely on these filings in forming his belief that
he would eventually receive such stock.  In fact, Ross has
repeatedly contacted Harrington to request his stock despite the
contents of Celtron, Inc.'s securities filings.  Accordingly,
Ross did not rely on the information contained in Celtron, Inc.'s
securities filings, and thus, these filings did not proximately
cause him to incur any damages.  See Highlands Ins. Co., 373 F.3d
at 351.  Therefore, no reasonable steps Harrington might have
taken would have averted any loss to Ross.  See Francis, 432 A.2d
at 826 (noting that in the case of alleged negligent omissions by
a director, the Court must determine the reasonable steps the
director should have taken and whether such steps would have
averted the loss).  The Court will grant the motion for summary
judgment on Plaintiffs' negligence of directors and officers
claim against Harrington.

### G.   Tortious Interference with Contract

Plaintiffs allege that Harrington and Engelbrecht intentionally and maliciously interfered with the 5-23-95 Agreement by causing Celtron, Inc. to breach the agreement.  (Pl. Stmt. of Add'l. Mat. Facts, at ¶ 54; see dkt. entry no. 43, Am. Compl., at ¶ 198; Pl. Br., at 21.)  Plaintiffs further allege that as a direct result of Harrington and Engelbrecht's conduct, Celtron International and its successor companies "failed to perform its obligations under the Contract, including, but not limited to, the issuance to [Ross] of 1.8 million shares of [Celtron, Inc.] stock after the purported restriction period ended in November 2004."  (See dkt. entry no. 43, Am. Compl., at ¶ 199; Pl. Br., at 21.)  In contrast, Defendants assert that Harrington did not interfere with any of Ross's contractual rights because Ross was not entitled to stock in Celtron, Inc. under the 5-23-95 Agreement.  (Defs. Br., at 21.)  In the alternative, Defendants assert that Harrington cannot be held liable for interfering with Ross' contractual rights because he was acting as CEO of Celtron, Inc., and not in his individual capacity, when he refused Ross's request for stock.  (Id.)  Defendants also argue that there is no evidence that Engelbrecht was involved in any way with Celtron, Inc.'s refusal to issue Ross stock.  (Id. at 22.)

36

To state a tortious interference with contract claim, the plaintiff must show (1) intentional or malicious interference "with a prospective or existing economic or contractual relationship with a third party", (2) that the interference caused a loss of prospective gain, and (3) damages. <u>Angrisani</u>, 175 Fed.Appx. at 557; <u>see</u> <u>Cox v. Simon</u>, 651 A.2d 476, 483 (N.J. App. Div. 1995) ("A plaintiff must prove actual interference with a contractual relationship, malice, and actual damages to succeed on a claim of intentional interference with a contractual relationship."). A person acts with malice when he or she intentionally commits a wrongful act without a justification. <u>Cox</u>, 651 A.2d at 483.

It must be a third party that interferes with the contract. Accordingly, a tortious interference with contract claim cannot be directed at a person or entity that is a party to the contract. <u>Emerson Radio Corp. v. Orion Sales, Inc.</u>, 253 F.3d 159, 173 (3d Cir. 2001). Thus, "[a]n employee working for the corporation with which the plaintiff allegedly had a contract cannot serve as the third-party necessary for the tripartite relationship, unless the employee acted outside the scope of his employment." <u>Silvestre v. Bell Atl. Corp.</u>, 973 F.Supp. 475, 486 (D.N.J. 1997).

Even assuming Celtron, Inc. is a successor of Celtron, PLC and thus assumed its obligations under the 5-23-95 Agreement,

Harrington cannot be held liable for any alleged interference
with that agreement because, as the former CEO of Celtron, Inc.,
he was a party to that agreement at all times relevant to
Plaintiffs' tortious interference claim.  (See Defs. Br., at 21;
dkt. entry no. 43, Am. Compl., at ¶ 7 (noting that at all
relevant times, Harrington was chairman of the board of
directors, CEO, secretary, and a major stockholder of Celtron,
Inc).)  See Silvestre, 973 F.Supp. at 486.  Further, Plaintiffs
have not shown that Harrington acted outside the scope of his
employment when he informed Ross that he was not entitled to any
stock in Celtron, Inc.  It is certainly within the scope of an
officer's employment to inform a party seeking ownership in the
company that he is not entitled to such ownership.  Thus, summary
judgment is appropriate on Plaintiffs' tortious interference with
contract claim insofar as it is asserted against Harrington.

Engelbrecht, however, was not an officer or employee of
Celtron, Inc. at any time relevant to Plaintiffs' tortious
interference with contract claim.  (See dkt. entry no. 43, Am.
Compl., at ¶ 15 (noting that at all relevant times, Engelbrecht
was a stock promoter for Celtron, Inc.).)  Moreover, Plaintiffs'
and Defendants' conflicting assertions preclude summary judgment
on this claim because questions of fact as well as issues of
credibility and reliance exist.  Specifically, the parties offer
conflicting evidence regarding whether (1) Ross was entitled to

receive shares of Celtron Inc.'s stock under the 5-23-95 Agreement, (2) Engelbrecht had significant influence over Celtron, Inc., (3) Engelbrecht directed Harrington not to issue any Celtron, Inc. stock to Ross, and (4) Engelbrecht acted with malice. (See Pl. Resp. Stmt. of Mat. Facts., at ¶¶ 13-15; Pl. Stmt. of Add'l. Mat. Facts, at ¶¶ 53-55; Pl. Br., at 11; Defs. Resp. to Pl. Stmt. of Add'l. Mat. Facts, at ¶¶ 53-55; Defs. Br., at 22 (noting that there is "no proof that Engelbrecht took any action leading to Celtron not issuing stock to Ross").) Thus, genuine issues of fact exist with respect to whether Engelbrecht intentionally and maliciously interfered with the 5-23-95 Agreement. Thus, the Court will deny the motion for summary judgment on Plaintiffs' tortious interference with contract claim insofar as it is asserted against Engelbrecht.

### CONCLUSION

The Court, for the reasons stated supra, will (1) deny Defendants' motion for summary judgment with respect to count 1 (breach of contract), count 2 (promissory estoppel), and count 13 (tortious interference with contract), as it pertains to Engelbrecht, of the amended complaint, and (2) grant Defendants' motion for summary judgment with respect to count 3 (common law fraud), count 4 (securities fraud), count 6 (NJRICO), count 7 (NJRICO conspiracy), count 12 (negligence of directors and officers), and count 13 (tortious interference with contract), as

it pertains to Harrington, of the amended complaint.

Accordingly, the following claims remain pending in this action:
(1) breach of contract claim against Harrington, Celtron, Inc.,
and Celtron International; (2) promissory estoppel claim against
Harrington, Celtron, Inc., and Celtron International; (3)
tortious interference with contract claim only insofar as it is
asserted against Engelbrecht; and (4) fraudulent conveyance claim
against Harrington and Amanda Harrington.  (Dkt. entry no. 84, 6-
7-07 Pl. Ltr., Ex. A.)  The Court will issue an appropriate order
and judgment separately.

 

 

 

 

 

 

        s/ Mary L. Cooper
**MARY L. COOPER**
United States District Judge